UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JUDICIAL WATCH, INC.**, <br><br> Plaintiff, <br><br> v. <br><br> **U.S. DEPARTMENT OF JUSTICE**, <br><br> Defendant. | Case No. 23-cv-01485 (CRC) |

## MEMORANDUM OPINION

In this Freedom of Information Act ("FOIA") case, Judicial Watch seeks from the United States Department of Justice ("DOJ") employee rosters for the office of Special Counsel Jack Smith. DOJ identified two such rosters and withheld them in full under FOIA Exemptions 6, 7(A), and 7(C).

Both parties seek summary judgment. The only dispute is whether DOJ properly withheld the records under the claimed FOIA exemptions with respect to employees in the Special Counsel's office who are at the GS-14 level or higher and whose employment has not already been disclosed to Judicial Watch. For the reasons explained below, the Court will grant summary judgment for DOJ and deny summary judgment for Judicial Watch.

I. **Background**

United States Attorney General Merrick Garland appointed Jack Smith to serve as Special Counsel and tasked him with investigating alleged "efforts to interfere with the lawful transfer of power following the 2020 presidential election" and alleged mishandling of classified documents and presidential records. DOJ Statement of Undisputed Facts ("DOJ SOUF") ¶ 1. Special Counsel Smith then obtained indictments against former President Donald Trump and

two other defendants.  See United States v. Trump, No. 9:23-cr-80101-AMC (S.D. Fla.); United States v. Trump, No. 23-cr-257-TSC (D.D.C.).

In December 2022, before the indictments issued, Judicial Watch submitted a FOIA request to DOJ seeking "[a]ll staff rosters, phone lists, or similar records depicting all employees hired by or detailed to the office of Special Counsel Jack Smith[.]"  DOJ SOUF ¶ 3; First Decl. of Vanessa R. Brinkmann ("First Brinkmann Decl."), at Ex. B.  DOJ then searched its records and identified two responsive records containing the names of all employees hired by or detailed to the Special Counsel's office ("SCO") at two different points in time.  DOJ SOUF ¶ 6.  One of those records also includes employees' telephone numbers and email addresses.  Id.

DOJ withheld the responsive records under FOIA Exemptions 6, 7(A), and 7(C).  DOJ SOUF ¶¶ 7, 9; see 5 U.S.C. § 552(b)(6), (7)(A), 7(C).  DOJ also identified for Judicial Watch ten individuals whose affiliation with the SCO had been made public as of August 9, 2023.  DOJ SOUF ¶¶ 7, 9.

In the parties' final joint status report before summary judgment briefing, Judicial Watch informed the Court that it only disputes DOJ's assertion of those three exemptions as to the names of employees at the GS-14 level or higher.  Joint Status Report ¶ 5 (Nov. 3, 2023).  Judicial Watch does not dispute the adequacy of DOJ's search.  Id.  Nor does it contest DOJ's withholding of (1) all employees' contact information or (2) the names of employees below the GS-14 level.  Id.

The parties filed cross-motions for summary judgment.  Those motions are ripe for review.

## II. Legal Standard

Summary judgment may be granted when the moving party establishes that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Summary judgment is the typical mechanism to determine whether an agency has met its FOIA obligations. See, e.g., Jud. Watch, Inc. v. CFPB, 60 F. Supp. 3d 1, 6 (D.D.C. 2014).

To obtain summary judgment on its invocation of a FOIA exemption, the agency must first show that the material falls under an enumerated exemption. Larson v. Dep't of State, 565 F.3d 857, 862 (D.C. Cir. 2009). Agencies can do so by providing sufficiently detailed declarations. Id. "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible." Jud. Watch, Inc. v. DOJ, 715 F.3d 937, 941 (D.C. Cir. 2013) (quotation marks omitted). Because the primary purpose of FOIA is disclosure, exemptions are construed narrowly. DiBacco v. U.S. Army, 795 F.3d 178, 183 (D.C. Cir. 2015).

Next, the agency must make a "focused and concrete" showing that disclosing the withheld records would cause foreseeable harm. Reps. Comm. for Freedom of the Press v. FBI, 3 F.4th 350, 370 (D.C. Cir. 2021); 5 U.S.C. § 552(a)(8)(A)(i)(I).

Finally, the agency must demonstrate that it has produced "[a]ny reasonably segregable portion of a record . . . after deletion of the portions which are exempt[.]" 5 U.S.C. § 552(b). Agencies must explain why non-exempt material is not reasonably segregable, and "are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material." Sussman v. U.S. Marshals Serv., 494 F.3d 1106, 1117 (D.C. Cir. 2007).

## III. Analysis

The Court finds that DOJ has proven that the rosters fall under FOIA Exemptions 6, 7(A), and 7(C). The Court will begin with Exemption 7(A) before addressing Exemptions 6 and

3

7(C) together. Additionally, the Court finds that DOJ has demonstrated foreseeable harm would result from disclosure and that it met its obligations to produce segregable material.

A. Exemption 7(A)

The Court first finds that DOJ properly invoked Exemption 7(A). DOJ must make two showings: (1) that the records were "compiled for law enforcement purposes" and (2) that disclosure "could reasonably be expected to interfere with enforcement proceedings[.]" 5 U.S.C. § 552(b)(7)(A). The Court addresses each in turn.

*1. Law-Enforcement Purposes*

To demonstrate that the rosters were compiled for law-enforcement purposes, DOJ must establish that the rosters "relate to anything that can fairly be characterized as an enforcement proceeding[.]" Bartko v. DOJ, 898 F.3d 51, 64 (D.C. Cir. 2018). Such proceedings include investigations where there exists (1) "a rational nexus between the investigation and one of the agency's law enforcement duties" and (2) "a connection between an individual or incident and a possible security risk or violation of federal law." Ctr. for Nat. Sec. Studies v. DOJ, 331 F.3d 918, 926 (D.C. Cir. 2003) (quoting Campbell v. DOJ, 164 F.3d 20, 32 (D.C. Cir. 1998)). DOJ's claim of a law-enforcement purpose is entitled to deference. Id.

The withheld records meet both criteria. The SCO created them "to facilitate coordination and communication among the SCO investigators and staff as they conduct ongoing enforcement proceedings." First Brinkmann Decl. ¶ 18. Those proceedings include investigations into alleged illegal interference in the 2020 election and mishandling of classified documents and presidential records. Id.; DOJ SOUF ¶ 1. The SCO's investigations have a rational nexus to DOJ's law-enforcement mission and are connected to both possible security risks and violations of federal law.

Judicial Watch does not dispute that the Special Counsel's investigations can fairly be characterized as enforcement proceedings. Instead, it argues that the withheld records do not relate to the investigation because they are mundane lists of employees that all employers maintain regardless of whether they are investigating potential criminal conduct. Judicial Watch Opp'n Summ. J. & Cross-Mot. Summ. J. ("Judicial Watch Opp'n") at 3–6. Judicial Watch may be correct that employee rosters are common, and that most employee rosters are not related to ongoing enforcement proceedings. But the fact remains that *these* employee rosters describe everyone working on active criminal investigations and were created to facilitate those investigations. They therefore relate to enforcement proceedings. Another court in this district reached the same conclusion in Citizens for Responsibility and Ethics in Washington v. DOJ ("CREW"), No. 20-cv-212 (EGS), 2022 WL 4598537 (D.D.C. Sept. 30, 2022), holding that a spreadsheet tab listing the names and salaries of investigators in a different Special Counsel's office was compiled for law-enforcement purposes because DOJ "needs to track the identities of its members . . . to maintain an organized investigation." Id. at *2, *4.

Judicial Watch's reliance on cases discussing agencies' internal investigations of their own employees is misplaced. See Judicial Watch Opp'n at 4. An agency's investigation of misconduct by its own employees is not necessarily an enforcement proceeding, and records created during such an investigation do not necessarily fall under Exemption 7. See, e.g., Bartko, 898 F.3d at 64; Stern v. FBI, 737 F.2d 84, 89 (D.C. Cir. 1984); Rural Housing All. v. U.S. Dep't of Ag., 498 F.2d 73, 81–82 (D.C. Cir. 1974). Here, however, DOJ is not investigating its own employees. Nothing in the record indicates that DOJ created these rosters for internal investigations. Instead, DOJ is investigating outsiders, including former President Trump. See Stern, 737 F.2d at 89 ("The vast majority of investigations that have been found to

be conducted for 'law enforcement purposes'" are "investigation[s] of non-agency personnel and of activities external to the agency's own operations."). Judicial Watch's internal-investigation cases are therefore inapposite.

### 2. Interference with Enforcement Proceedings

Next, the Court turns to Exemption 7(A)'s requirement that disclosure "could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). The Court finds that DOJ has satisfied this requirement for two independent reasons.

First, it appears logical and plausible that disclosing the rosters would expose SCO employees to threats and harassment. The Special Counsel is investigating the former President of the United States and events surrounding one of the most fraught elections in recent American history. The SCO has attracted "unprecedented public scrutiny and partisan political attacks[.]" First Brinkmann Decl. ¶ 22. "Since the SCO began its work, harassing, vulgar, and/or threatening communications have been received by SCO staff, even including harassing physical mail sent to one SCO staff member's private residence[.]" Id. SCO employees have also been targeted by "swatting" attacks at their homes, including both the Special Counsel himself and at least one other member of the office. Second Declaration of Vanessa Brinkmann ("Second Brinkmann Decl.") ¶ 6. An attorney in the SCO was also doxed, meaning that the attorney's home address was publicly revealed without the attorney's consent. See id. These threats and harassment are unlikely to end while the Special Counsel's investigations continue, as harassment of SCO employees "has, if anything, only increased with time and with developments in the SCO's activities." Id. ¶ 7.

These threats make it harder for the SCO to do its work by distracting employees and disrupting their work. See First Brinkmann Decl. ¶ 22. "Messages designed to generate alarm

and dread, and to trigger extraordinary safety precautions, will necessarily hinder the trial process and slow the administration of justice." United States v. Trump, 88 F.4th 990, 1014 (D.C. Cir. 2023).

Judicial Watch's counterarguments are unpersuasive. Judicial Watch first argues that DOJ's claims of threats and harassment are "entirely conclusory, little more than speculation, and lack[] meaningful evidentiary support." Judicial Watch Opp'n at 10. But DOJ's declarations offer detailed accounts of threats and harassment against SCO employees, including harassing mail sent to staffers' home addresses, attempted swatting attacks, and doxing. See Second Brinkmann Decl. ¶ 6. Again, all DOJ must do is articulate a rationale that "appears logical or plausible." Jud. Watch, 715 F.3d at 941 (quotation marks omitted). And based on the threats and harassment DOJ has described in its declarations, the Court finds it is both logical and plausible that disclosure of employees' names and their contact information will expose them to harassment and threats that will impede their ability to perform their public duties.

Nor does it matter that DOJ's declarations contain hearsay. See Judicial Watch Opp'n at 12 (DOJ's declarations "suffer[] from a hearsay problem[.]"); see also First Brinkmann Decl. ¶ 22 (DOJ "conferred directly with the SCO's Chief Security Officer in assessing the security risks to SCO staff."). "FOIA declarants may include statements in their declarations based on information they have obtained in the course of their official duties," including information that they "were told" by others. Barnard v. Dep't of Homeland Sec., 598 F. Supp. 2d 1, 19 (D.D.C. 2009); see Ecological Rights Found. v. EPA, 541 F. Supp. 3d 34, 50 (D.D.C. 2021) (finding no hearsay problem in FOIA case where information in declaration was "supplied by employees under [the declarant's] supervision or employees in other EPA offices" (cleaned up)).

Second, it appears logical and plausible that revealing the names of SCO employees may reveal nonpublic information about the office's ongoing investigations, including its focus and scope. Information about an investigation's "focus and scope" is "precisely the sort of information exemption 7(A) allows an agency to keep secret." Swan v. SEC, 96 F.3d 498, 500 (D.C. Cir. 1996). At first blush, an employee roster may not itself say much about an office's workings. But disclosing these rosters would reveal more than just employees' names. Members of the public could search for the names of SCO employees to find additional information about the employees, including their home addresses, email addresses, and other contact information. First Brinkmann Decl. ¶ 22; see Judicial Watch Opp'n at 12 ("It appears from the common formatting of the SCO attorneys' email addresses on [public court filings] that it is possible to identify the likely email addresses of other SCO staffers."). That identifying information could then enable someone to track or surveil employees, and "[r]ecent experience has shown that individuals conducting high-profile DOJ investigations, such as this one, may be surveilled[.]" First Brinkmann Decl. ¶ 26. Surveilling investigators could then lead the public to "obtain[] non-public information about the pending proceedings, such as the identities of cooperating witnesses or potential defendants, the timing of the filing of charges, and the location of relevant evidence." Id. The public could also find employees' professional backgrounds and areas of expertise and use that information to surmise what the Special Counsel might be investigating. Id. ¶ 27.

Disclosing the list of employees would also reveal information about the size of the SCO and therefore the scope of the Special Counsel's investigation. In CREW, the court held that personnel records were shielded by Exemption 7(A) because they revealed the "number of members" working on an ongoing investigation and disclosure would publicly reveal the

8

investigation's scope.  2022 WL 4598537, at *7; see Swan, 96 F.3d at 500 (holding that records that would reveal an investigation's scope are covered by Exemption 7(A)).  So too here.  Releasing the rosters would reveal to the public how many people were working in the SCO when the records were created.  While Judicial Watch is correct that these rosters are no longer current, the same is likely true of many records withheld under Exemption 7(A) by the time a FOIA case gets to the summary-judgment stage given the time it takes for agencies to search their records, requesters to exhaust their administrative remedies, parties to discuss settlement and prepare cross-motions for summary judgment, and courts to decide the parties' motions.  Yet courts continue to find those documents properly withheld under Exemption 7(A).  See, e.g., CREW, 2022 WL 4598537, at *1–2 (granting summary judgment to agency based on Exemption 7(A) in 2022, when the records were requested in 2019 and suit was filed in 2020).

      Applying Exemption 7(A) to older records makes sense because even old information can reveal information regarding an ongoing investigation.  For example, if the SCO's office was relatively small when these records were created, then that might suggest that the Special Counsel's investigation was relatively cabined during the early stages of the investigation and that future indictments are less likely.  The public could also use the two lists, which were created at two different points in time, to track changes in the SCO's staffing.  See First Brinkmann Decl. ¶¶ 21, 24.  An increase in staffing could suggest that the Special Counsel expanded the investigation, while departures by employees who share expertise in one area of the law may suggest that the Special Counsel has changed direction.  Either way, releasing the rosters could reveal nonpublic information about the scope, direction, and focus of the Special Counsel's investigations.

To be sure, many SCO employees have revealed their identities by making public appearances in the office's cases. See Judicial Watch Opp'n at 12 (asserting that Judicial Watch identified 23 SCO employees through "the public dockets of the SCO's litigation and a quick internet search"). But the fact that some employees have been publicly revealed does not change that disclosing the records could reveal information about as-yet unidentified employees and nonpublic information about the scope, direction, and focus of the Special Counsel's investigations.

In any event, DOJ provided to Judicial Watch the names of individuals whose affiliation with the SCO had already been made public as of the date of DOJ's final production to Judicial Watch. First Brinkmann Decl. ¶ 21; Second Brinkmann Decl. ¶ 5. While others have since made public appearances in the SCO's cases, those appearances came after DOJ finalized its production. Second Brinkmann Decl. ¶ 5. DOJ is not required to update its completed productions. Sai v. TSA, 315 F. Supp. 3d 218, 254 (D.D.C. 2018); James v. U.S. Secret Serv., 811 F. Supp. 2d 351, 358 (D.D.C. 2011).

Because DOJ's rationales for invoking Exemption 7(A) appear logical and plausible, the Court holds that DOJ has demonstrated that the rosters fall within Exemption 7(A).

B. Exemptions 6 and 7(C)

Next, the Court also finds that DOJ properly invoked Exemptions 6 and 7(C). Exemption 6 shields records if disclosure "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Exemption 7(C) has a narrower scope, as it applies only to records compiled for law-enforcement purposes. Id. § 552(b)(7). But it sets a lower standard for nondisclosure, shielding law-enforcement records if disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy." Id. § 552(b)(7)(C).

Given their significant overlap, as well as the Court's earlier finding that the rosters were compiled for law-enforcement purposes, the Court will address these two exemptions together. See Reed v. NLRB, 927 F.2d 1249, 1251 (D.C. Cir. 1991); Jud. Watch, Inc. v. DOJ, 394 F. Supp. 3d 111, 116–17 (D.D.C. 2019). Under both exemptions, courts must weigh any "substantial," protected privacy interest against any public interest in disclosure. SafeCard Servs. v. SEC, 926 F.2d 1197, 1205 (D.C. Cir. 1991); Guarascio v. FBI, No. 18-cv-2791 (CRC), 2023 WL 7182057, at *9 (D.D.C. Nov. 1, 2023). DOJ has demonstrated that the balance in this case tips decidedly against disclosure.

On the privacy interests side of the balance, "investigating agents" like the SCO's employees have a "substantial interest in ensuring that their relationship to the investigations remains secret." Roth v. DOJ, 642 F.3d 1161, 1174 (D.C. Cir. 2011) (quotation marks omitted). Those privacy interests are all the greater here given the record of threats and harassment directed towards those affiliated with the Special Counsel's investigations. See supra at 6–7; see also Lesar v. DOJ, 636 F.2d 472, 487 (D.C. Cir. 1980) (Law enforcement agents "have a legitimate interest in preserving the secrecy of matters that conceivably could subject them to annoyance or harassment in either their official or private lives."); Talbot v. Dep't of State, 315 F. Supp. 3d 355, 374 (D.D.C. 2018) (upholding invocation of Exemption 6 where "the release of [withheld] names and other identifying information would be reasonably likely to subject individuals or those associated with them to increased harassment or threats.").

Judicial Watch attempts to shortchange these interests by claiming that employees do not have an interest in shielding their names alone. See Judicial Watch Opp'n at 14–16. That is mistaken for two reasons. First, FOIA's privacy exemptions cover "information which applies to a particular individual." Dep't of State v. Wash. Post Co., 456 U.S. 595, 602 (1982). That broad

11

ambit includes "bits of personal information, such as *names* and addresses[.]"  Jud. Watch, Inc. v. FDA, 449 F.3d 141, 152 (D.C. Cir. 2006) (emphasis added); see Niskanen Ctr. v. FERC, 20 F.4th 787, 791 (D.C. Cir. 2021) (same).  Second, SCO employees have an interest in shielding their connection to the Special Counsel's investigations.  Disclosing their names would reveal those connections.

On the other side of the balance, the public interest in the disclosure of SCO employees' names is weak given that the undisclosed employees on the rosters "are not in leadership or supervisory positions in the SCO and do not hold policy-making authority."  First Brinkmann Decl. ¶ 36.  Indeed, Judicial Watch has not identified a single person who DOJ failed to disclose who qualifies as a senior official with policymaking authority, even though Judicial Watch purports to have identified fourteen individuals affiliated with the SCO who were not disclosed by DOJ.  See Judicial Watch Opp'n at 16.  Revealing the undisclosed names would do little to advance "[t]he only public interest that carries weight" in the FOIA context:  "'the citizens' right to be informed about what their Government is up to.'"  Guarascio, 2023 WL 7182057, at *9 (quoting Davis v. DOJ, 968 F.2d 1276, 1282 (D.C. Cir. 1992)); see Jud. Watch, Inc. v. DOJ, 616 F. Supp. 3d 13, 20 (D.D.C. 2022) (Where officials are not "particularly senior or in . . . policy-making role[s] . . . [t]here is . . . little legitimate public interest in disclosure of their names.").

It may be correct that a Special Counsel's lower level hiring practices could be suggestive of partisan bias.  But Judicial Watch has not given any reason to think that the SCO has engaged in prosecutorial misconduct in its investigations.  Requesters may obtain private information under FOIA only if they "produce evidence that would warrant a belief by a reasonable person that [an] alleged Government impropriety might have occurred."  Blackwell v. FBI, 646 F.3d 37, 41 (D.C. Cir. 2011) (quoting Nat'l Archives & Recs. Admin. v. Favish, 541 U.S. 157, 174

(2011)). Here, all Judicial Watch offers are irrelevant asides about former Special Counsel Robert Mueller's and Fulton County District Attorney Fani Willis's investigations of former President Trump. See Judicial Watch Opp'n at 20–21. But Judicial Watch has not produced a shred of evidence of misconduct by Special Counsel Smith or anyone in his office. That is not enough for a reasonable person to believe that any SCO staff have acted improperly.

In view of the strong privacy interests on one side and the nonexistent public interests on the other, the Court concludes that DOJ properly invoked Exemption 7(C). See Nat'l Ass'n of Retired Fed. Emps. v. Horner, 879 F.2d 873, 879 (D.C. Cir. 1989) ("We need not linger over the balance; something, even a modest privacy interest, outweighs nothing every time.").

C. Foreseeable Harm and Segregability

Finally, the Court finds that DOJ has met its burden of demonstrating that disclosure would cause foreseeable harm and that it met its obligation to produce reasonably segregable information.

First, DOJ was required to demonstrate that it is reasonably foreseeable that disclosure would cause harm. Reps. Comm., 3 F.4th at 369; 5 U.S.C. § 552(a)(8)(A)(i)(I). That is not a high bar here, because foreseeable harm is "manifest" where disclosure would cause ridicule or harassment. See Amiri v. Nat'l Sci. Found., 664 F. Supp. 3d 1, 21 (D.D.C. 2021); Ecological Rights Found., 541 F. Supp. 3d at 65 ("[W]hen invoking Exemption 7(C), an agency need not establish much more than the fact of disclosure to establish foreseeable harm."). For the reasons discussed above, DOJ has proven that disclosure would foreseeably cause harm by revealing nonpublic information about ongoing investigations and exposing SCO employees to potential harassment and threats.

Second, DOJ was also required to produce all "reasonably segregable" information from the otherwise exempt rosters. Sussman, 494 F.3d at 1116; 5 U.S.C. § 552(b). The Court presumes that DOJ has complied with that obligation. Sussman, 494 F.3d at 1117. Here, DOJ has already released the names of individuals whose affiliation with the SCO had become public prior to DOJ's final production. First Brinkmann Decl. ¶ 21; Second Brinkmann Decl. ¶ 5. And DOJ has further explained that releasing redacted rosters could enable the public to estimate the size of the SCO because all the entries in the rosters are printed in the same font and size. First Brinkmann Decl. ¶ 21. As such, the Court concludes that DOJ has produced all releasable information that could be reasonably segregated from the non-releasable portions.

## IV. Conclusion

For these reasons, the Court grants DOJ's Motion for Summary Judgment and denies Judicial Watch's Motion for Summary Judgment

A separate order accompanies this opinion.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  September 4, 2024